**HULL et al. v. FITZ–GERALD.**

No. 6029.

Court of Civil Appeals of Texas. Amarillo.

March 27, 1950.

Rehearing Denied May 8, 1950.

94

Martin, Moore & Brewster, Fort Worth, Alvin R. Allison, Levelland, for appellants.

Turner, Rodgers, Winn & Scurlock, Dallas, Gerald Fitz-Gerald, Midland, Texas and Lloyd Croslin, Lubbock, for appellee.

LUMPKIN, Justice.

In this suit the plaintiffs, H. Winston Hull and Charles C. Green, seek to recover from the defendant, James Fitz-Gerald, Jr., upon the theory of a constructive trust, an undivided one-half interest in a certain oil and gas lease covering seven tracts of land located in Hockley County, Texas. These tracts are owned by W. T. Coble and hereafter will be referred to as the Coble lands.

After the introduction of plaintiffs' testimony in a trial before a jury, the court peremptorily directed a verdict in favor of the defendant and rendered judgment accordingly. To this judgment the plaintiffs duly excepted and have perfected their appeal to this court.

The plaintiffs Hull and Green were employees of the Texas Gulf Producing Company, a corporation engaged in the production of oil with its general offices at Houston. Hull was the Company's land man in West Texas, while Green was a district geologist. The defendant Fitz-Gerald was an independent oil operator. The three men were friends of long standing and had had many business dealings with each other. Their homes and offices were located at Midland, Texas.

During the period covered by this suit, the plaintiffs had an agreement with their employer, Texas Gulf Producing Company, that they could enter into transactions involving oil and gas leases as their separate business. These transactions were to be submitted first to their employer, but if the transaction, or deal, was refused by their employer, then the plaintiffs were free to make for themselves whatever kind of contract they wished.

The plaintiffs alleged that early in May of 1947 they had become interested in several areas of land in Hockley County, including the Coble lands, as possible locations for oil and gas production. On May 27, 1947, according to the plaintiffs' pleadings, the defendant approached Hull and Green with the suggestion that the three procure oil and gas leases on likely property in West Texas. The plaintiffs told

defendant of their interest in the Coble lands and exhibited to him a map or plat which showed the location of property in Hockley County likely to produce oil and gas. On this occasion the plaintiff Green informed the defendant that he had conducted a detailed study of this area and that in his opinion as a geologist the area had great possibilities· for· the. production of oil and gas.

The plaintiffs alleged that on May 27, 1947, and at subsequent conferences, they entered into an oral agreement with the defendant. In substance the agreement provided that the defendant would ascertain what lands in Hockley County, specifically the Coble lands, were available for oil and gas leases; that the information concerning these proposed leases was to be submitted to the Texas Gulf Producing Company, but that if these transactions were not accepted by the Company, then Fitz-Gerald, Hull and Green would take the leases for themselves and resell or handle them as joint adventurers for their joint profit. The plaintiffs' allegations continue:

"It was the agreement of the parties plaintiffs and defendant that the title to such properties * * * should be taken in the names of all three of them, with the oral understanding and agreement that plaintiffs jointly should have an undivided one-half interest therein and the defendant should have an undivided one-half interest therein; that plaintiffs, as between the parties, should be obligated jointly for one-half of the total obligations incurred by reason of the acquisition of oil and gas contracts on such properties, the defendant should be obligated for one-half of such total obligations so incurred, and the profits or losses to be shared in like proportion, that is to say, one-half thereof jointly by or to plaintiffs and one-half thereof by or to the defendant."

The plaintiffs further alleged that the defendant learned that W. T. Coble was willing to lease portions of his property in Hockley County. The defendant conveyed the general terms of the proposed lease on the Coble lands to the plaintiffs, who submitted these terms to the Texas

Gulf Producing Company. The Company declined Coble's terms. This information, the plaintiffs alleged, was conveyed to the defendant together with information that the plaintiffs were free to contract for an oil and gas lease on the Coble lands. After this message from the plaintiffs, the defendant entered into negotiations with A. W. Thompson and Pat M: Carr to determine if the firm of Thompson, Carr & Forster, drilling contractors, would accept, as payment for drilling, an assignment of an interest in a lease contract on the Coble lands. Thompson, Carr & Forster agreed that they would accept an undivided one-half interest in the lease contract and that in the event the first well drilled was nonproductive, the cost of drilling would be the sole expense of Thompson, Carr & Forster. After reaching this agreement with the drilling contractors the defendant, on July 2, 1947, obtained in his name only a lease from Coble on the seven tracts of land.

In his answer, among other allegations, the defendant denies that he ever had a· partnership arrangement with the plaintiffs concerning the Coble lease.

The defendant's motion for an instructed verdict was in three parts: (1) That the purported oral agreement of May 27, 1947, was in violation of the Texas Securities Act, Article 600a, Vernon's Annotated Civil Statutes; (2) That the alleged oral agreement by which the plaintiffs seek to impress an oral trust upon the oil and gas lease from Coble to the defendant is an expressed parol trust prohibited by the Texas Trust Act, Article 7425b—7, Vernon's Annotated Civil Statutes; (3) That the terms of the purported oral contract between the plaintiffs and the defendant are too vague and uncertain to impose a parol trust upon the Coble oil and gas lease.

In discussing the several points of error presented by the plaintiffs, we shall first direct our attention to the third portion of the defendant's motion for an instructed verdict. In it the defendant contends, in effect, that the alleged agreement of May 27, 1947, is too vague and uncertain to constitute· a valid oral contract; that the purported oral agreement does not show a

mutual assent of the parties to the same thing, in the same sense, at the same time. We cannot agree with the defendant in this contention.

■■■ In determining whether a trial court's action in granting a motion for a peremptory instruction was proper, the appellate court will view the evidence in the light most favorable to the losing party, will disregard the conflicts in testimony, and will indulge, in favor of the appellant, every intendment reasonably deducible from the evidence. White v. White, 141 Tex. 328, 172 S.W.2d 295. When an appeal is from a judgment on an instructed verdict for the defendant, the controlling question is whether there is any evidence in the record which, when considered by itself, would, if accepted by a jury, have raised an issue of fact which would have supported a judgment in favor of the plaintiff. Continental Ins. Co. v. Johnson, Tex.Civ.App., 216 S. W.2d 635, writ. ref. However, an appellate court will not reverse a judgment based on an instructed verdict unless the appellant demonstrates that there is sufficient evidence to support fact-findings in accordance with his cause of action. Neyland v. State, Tex.Civ.App., 151 S.W.2d 331.

Whether an agreement to acquire an oil and gas lease on the Coble lands existed between the parties after their conversation of May 27, 1947, is a question of fact. Viewed in the light most favorable to the plaintiffs, the evidence bears out the plaintiffs' allegations, i. e., that the parties agreed that Fitz-Gerald was to work out the "best possible deal" for an oil and gas lease on the Coble lands and that if Coble's terms were not acceptable to the Texas Gulf Producing Company, then the lease was to be taken in the names of the three men. Fitz-Gerald was to obtain as much of the land designated by Green, including the Coble lands, as was available for oil and gas leases.

The conversation between the three men on May 27, 1947, was described by the plaintiff Hull in the following words:

"The conversation in general and in substance in the office that afternoon was to the effect that Jim [Fitz-Gerald] was to take the Coble acreage, he was to make the best possible deal he could if the deal was available, he was to convey to me the information as to the best possible deal he could make with the Cobles, and he was to make that deal in such a way that I would have an opportunity to convey that information to my main office and also in such a way that in the event Texas Gulf rejected the deal that Cobles made, he would still have an opportunity to take the lease in our names, Fitz-Gerald, Green and Hull, so that the three of us, as individuals, could make some acquisition for ourselves."

It appears that the defendant Fitz-Gerald had in his employ one Hollums. Several days after the conversation reported above, Hollums reported to the plaintiff Hull. Hull's testimony continues:

"There was a matter of a few days there that nothing was apparently done because it was several days later that Mr. Hollums reported to me that certain of the acreage in the recommended area was not then available for lease. It had been leased a matter of a few days prior. That information was conveyed on to the Houston office. The first information that I had from Mr. Fitz-Gerald concerning the Coble lands proper was when Mr. Hollums called me the latter part of June and related to me the terms of a deal which Mr. Fitz-Gerald was supposed to have told him to tell me as the deal that the Cobles would make.

\* \* \* \* \* \*

"Mr. Hollums was not as definite on the deal as he probably should have been because Jim had told him to call me, so Hollums said that the Cobles wanted no cash consideration, they wanted a well commenced in 30 days, they had some sort of gas clause which he didn't understand, but it was different than the usual gas clause; they demanded 5/16ths reserved royalty, and they demanded continuous development."

Hollums said nothing to Hull concerning a forfeiture in the event a well was not started within a certain period of time. On June 20, 1947, Hull telephoned Fitz-Gerald, who was in Fort Worth. Hull's testimony continues:

"I told Jim that Hollums had called me and that I wanted to know the terms of the deal * * * Jim said that it was essentially the same and he reiterated those terms, 5/16ths reserved royalty, a well in 30 days, approximately 1100 acres to be included in the lease, continuous development, and a gas clause that I didn't recall at that time but I since refreshed my memory on, and that essentially was the terms of the deal."

According to Hull's testimony, he told Fitz-Gerald that he would relay this information to his Houston office and call him back. The Texas Gulf Producing Company declined Coble's terms. On June 21, 1947, Hull again talked to Fitz-Gerald by long distance telephone. Hull testified.

"Well, I told Jim that I had talked with Houston, and that the Texas Gulf is not interested in the deal. I told him I thought it was good enough that we should go ahead and cinch it with the Cobles as best he could * * * he said I have already cinched it, I told him that he should take it for the three of us, for himself, Fitz-Gerald and Mr. Green and myself; that I had some ideas what we might be able to do with it, and he replied he had some ideas, too, and he had some working."

The testimony of the plaintiff Green is similar to that of Hull. Green said that he was with Hull on May 27, 1947, when Fitz-Gerald approached them with the question: "Where can we drill a well?" Green stated that he went into considerable detail with the defendant concerning the geological possibilities of the Coble lands. He said: "I remember distinctly that we did discuss the possibilities of a deal, and what kind could be made." Green also testified:

"I told Fitz-Gerald that the deal probably wouldn't involve too much cash, if any, and that we probably would have to commit ourselves to a drilling deal, and that we would probably have to continuously develop the properties if we made a deal with Coble; that there were other properties in the area that were available, or seemed to be available, that we might make a deal on, and that I was so interested in the area that in the event the Company failed to accept my recommendation and acquire the properties, that Fitz-Gerald, Hull, and myself should attempt to do so."

With respect to the proposed negotiations with Coble, Green said he told the defendant: "You make the deal, the best deal you are able to make." Further he testified:

"I said, at that time, that Winston [Hull] and I were operating as partners, as joint partners, as we always had, and that we would take over half of it, and he would take over the other half * * * I said, to Mr. Fitz-Gerald, that I had found out * * * that the Company probably would not be interested in this particular area * * *."

Green said that in the course of the conversation Hull told the defendant that he had talked with representatives of the Magnolia and Texas companies and that these companies had released certain acreage in Hockley County because of threatened litigation with Coble and that now this acreage was available for oil and gas leases. As to Fitz-Gerald's reply, Green said:

"Fitz-Gerald used his normal way of saying it: 'It sounds like a good deal, and we'll just go to work on it for the benefit of all of us, and we'll make some money.'"

As to what he would do to further the transaction, Green testified: "I would handle the geological end of it; I told him that."

On July 2, 1947, without the knowledge of Hull and Green, W. T. Coble executed an oil and gas lease to the defendant on the Coble lands. On July 17, 1947, the defendant assigned to A. W. Thompson, trustee, an undivided one-half interest in the Coble lease. This assignment was in keeping with an agreement between Fitz-Gerald and Thompson, Carr & Forster, drilling contractors. Thompson, Carr & Forster were to assume the drilling obligations required by Coble, and they agreed to develop the property in accordance with the requirements of the lease. According to the agreement between Thompson, Carr & Forster and the defendant, the drilling contractors were to have an undivided one-half

interest in the lease, and Fitz-Gerald was to have an undivided one-half interest in it.

Green said that he did the geological work on the first well and that he located it but that while this well was being drilled, his father had a severe stroke and he had to go visit him. Green testified:

"I told Mr. Fitz-Gerald of * * * my father's critical illness, and I further told him that if it was all right with him, I would like to go there and I thought it was my duty to be there, and that I had two men in mind for taking over the remaining operations * * * one, Joe Canon, and the other was R. S. Anderson * * *."

Green testified that the defendant on this occasion said: "He asked me if I would attend to it, and I said 'Certainly.' * * * He said 'Go ahead and do it. That is your end of the business.'" Green employed R. S. Anderson, who did the geological work for the other wells drilled on the Coble lands.

On July 31, 1947, the drilling contractors began the first well. This property continued to be drilled by Thompson, Carr & Forster until thirty-one wells, all of them producing, were completed. After the first two wells had been completed, agreements were made between the defendant and Thompson, Carr & Forster and the Stanolind Oil Purchasing Company, whereby Stanolind agreed to lend the defendant and the drilling contractors the money necessary to carry out the drilling provisons of the Coble lease. At the time of the trial, Stanolind had advanced $1,025,000. This sum is secured by a deed of trust executed by Fitz-Gerald and Thompson, Carr & Forster. After the drilling of the first well the plaintiffs learned that the Coble lease was in Fitz-Gerald's name only.

■ The evidence produced by the plaintiffs, if true, is of sufficient probative force to show that there was a meeting of the minds of the parties as to what property should be leased by the defendant and upon what terms it should be leased. According to the plaintiffs' testimony, it was fully understood by the parties that the proposed oil and gas lease should be in the names of Hull, Green and Fitz-Gerald; the plaintiffs were to have an undivided one-half interest in the lease, and Fitz-Gerald was to have an undivided one-half interest. The purpose of the oral agreement was to acquire for the parties by the best deal possible an oil and gas lease on the Coble lands. When considered by itself, the plaintiffs' testimony would have raised an issue of fact which, if accepted by the jury, would have supported a judgment in favor of the plaintiffs. As we have said, the question of whether an agreement existed between the parties to acquire an oil and gas lease on the Coble lands is one of fact. The trial court erred in not submitting this question of fact to the jury. Thompson, et al. v. Corbin et ux., Tex.Civ.App., 137 S.W.2d 157; Bennett v. McKrell, 135 Tex. 557, 144 S.W.2d 242; Texas Conservative Oil Company v. Jolly, Tex.Civ.App., 149 S.W.2d 265; MacDonald v. Follett, 142 Tex. 616, 180 S.W.2d 334.

In the second portion of his motion for an instructed verdict, the defendant contended that the plaintiffs are seeking to impress an express parol trust upon the Coble lease in violation of the Texas Trust Act, Article 7425b—7, Vernon's Annotated Civil Statutes. Section 7 of the Texas Trust Act does declare invalid express parol trusts as they relate to real estate, but resulting or constructive trusts are excepted from this rule by Section 2 of the same statute. In this case the pleadings and the evidence show that the purported agreement between the parties did not create a trust agreement of any kind. Under the alleged agreement the oil and gas lease was to be taken in the names of the three men. It is the plaintiffs' contention that a constructive trust was created by operation of law when Fitz-Gerald violated the agreement he had made with them to acquire the Coble lease in the names of all three and when he took the title to the property in his name alone.

■ A constructive trust is thrust upon a party contrary to his intention and against his consent. Such a trust is not within the intention or contemplation of the parties at the time the contract is made. Jairus Ware Perry, a Treatise on the Law of Trusts and Trustees, 6th Ed. p. 261. In

the case of Cawthon v. Cochell, Tex.Civ. App., 121 S.W.2d 414, 416, err. dis., this court defined a constructive trust as follows:

"A constructive trust * * * is a trust which is not expressed but is imposed upon a person by a court of equity upon the ground of public policy so as to prevent him from holding for his own benefit and advantage that which he has gained by reason of a fiduciary relation subsisting between him and those for whose benefit it is his duty to act."

■ The plaintiffs have not pleaded an expressed parol trust. Their pleadings and proof, if true, constitute, by operation of law, the basis of a constructive trust. Since this class of trust is exempt by Section 2 of the statute, the plaintiffs are not in violation of the Texas Trust Act.

By the first portion of his motion for a peremptory instruction the defendant asserted that the plaintiffs were dealers in securities, that they did not have a permit to buy and sell securities, that our courts have held an oil and gas lease to be a security, and that the plaintiffs' purported agreement with the defendant was a violation of the Texas Securities Act, Article 600a, Vernon's Annotated Civil Statutes.

■ The primary purpose of plaintiffs' suit, as revealed by the record, is to recover from the defendant an undivided one-half interest in the Coble lease. Our Supreme Court in the case of Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146, has pointed out that the Securities Act is intended to regulate sellers and sales of securities and to protect purchasers against sellers, but the Act does not undertake to regulate purchasers or to protect sellers against purchasers. In the instant case the plaintiffs, were purchasers rather than sellers. It was not necessary that they be licensed dealers under the Texas Securities Act in order to maintain this suit.

■ The plaintiffs complain of the trial court's action in excluding evidence designed to show that Hull and Green were willing to be bound by the agreement between Fitz-Gerald and the drilling contractors as well as by the agreement through which the money to finance the drilling of the lease was obtained from Stanolind. In effect, the plaintiffs were asked if they would have been willing to execute these various instruments and to be bound by their terms and stipulations. It is the plaintiffs' theory of the case that since they are in a court seeking equity, it is necessary to show that they were willing to be bound by the agreements made by Fitz-Gerald as soon as they knew the obligations of the joint adventure. "Having sought equitable relief, a party must offer or plead willingness to do equity. In fact he must go further and do equity. He will be required to do equity as a condition to the obtaining of relief." 17 Tex.Jur. 44. In our opinion the answers to the questions propounded to Hull and Green were admissible. Hammon v. United Royalties Corporation, Tex.Civ.App., 25 S.W.2d 961, err. dis.; Green v. Duncan, Tex.Civ.App., 134 S.W.2d 744; Kirkland v. Handrick, Tex. Civ.App., 173 S.W.2d 735, ref. w. m.

■ In their final points of error the plaintiffs insist the court erred in sustaining the defendant's objection to the testimony of A. W. Thompson. This testimony concerned a conversation between Thompson and Green relative to the filing of this suit. In the conversation, Thompson told Green that the filing of such a suit could make the financing of the drilling operations difficult. Thompson asked Green to delay any contemplated litigation until the drilling of the lease had been completed. The defendant objected to the admission of testimony as to any conversation between Thompson and Green during the early part of the year 1948, on the grounds that Fitz-Gerald was not present and that the conversation would be hearsay as to him; and, further, the defendant contended that the date of the conversation was subsequent to July 2, 1947, the date of the Coble lease, and was immaterial to any issue pleaded by the plaintiffs. The plaintiffs insist that this testimony was admissible to explain their delay in filing the suit. If on a second trial the question of plaintiffs' delay in filing the suit should become an issue,

Thompson's testimony as to the purported conversation with Green should be admitted in evidence.

We have carefully reviewed the record in this case. In our opinion the court erred in granting the peremptory instruction. The judgment is, therefore, reversed and the cause is remanded for another trial.